UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-23360-HOEVELER

SUSAN ATKISSON and
JOHN S. ATKISSON,

　　　Plaintiffs

v.

THE UNITED STATES OF AMERICA,

　　　Defendant.

_____

## ORDER AND MEMORANDUM OPINION

This is a medical malpractice case brought by Susan Atkisson and her husband, John Atkisson, against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2674. On April 19, 2007, while recovering from a reconstructive breast surgery at the Miami Veterans Affairs Medical Center (VAMC), Mrs. Atkisson experienced an episode of respiratory depression and hypoxemia as a result of morphine intake, and suffered a permanent brain injury. The case was tried to the Court, without a jury, from March 8 to March 11, 2010. Having considered all of the evidence, and the parties' pre-trial and post-trial submissions and arguments, and being otherwise fully advised in the premises, the Court hereby enters the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I. <u>Background</u>[1]

Mrs. Atkisson was admitted to the VAMC surgical unit on April 19, 2007 for re-constructive breast surgery following a previous bout with breast cancer. A certified plastic surgeon performed the operation from approximately 2:45 to 4:45 p.m., during which time Mrs. Atkisson received 10 mg of morphine for pain. At about 5 p.m., she was transferred from the Operating Room to the Post-Anesthesia Care Unit, known as the PACU, where she remained for two hours in recovery.[2] Upon arrival to the PACU, she complained of severe pain and her attending physician, Dr. Jonathan Fisher, prescribed 16 mg of morphine, to be administered in periodic 2 mg shots. Dr. Fisher also ordered Mrs. Atkisson a patient-controlled morphine pump, known as a "patient-controlled analgesic" or "PCA" for short, which allowed her to self-administer a 1 mg dose of morphine every 6 minutes, as needed. Mrs. Atkisson received 9 mg of PCA morphine in the PACU.

Although Mrs. Atkisson had used morphine and other opioid-based painkillers in connection with past surgeries, she was not

---

[1] To the extent there was conflicting evidence or testimony about any of the following facts, the recitations of fact and summaries of witness testimony in this Order represent the Court's findings and conclusions based on all the evidence at trial.

[2] Phillip Ang, a PACU nurse who attended Mrs. Atkisson, testified that all surgery patients spend time in the PACU for observation. He described the unit as consisting of seven beds, each with a full array of monitors, and doctors on duty at all times.

2

considered "opioid tolerant." Opioid tolerance develops in patients who use a daily dose of opioid medication, or multiple doses per day, over a prolonged period of time, thereby conditioning their livers to breakdown the medication. By comparison, Mrs. Atkisson's sporadic past use of morphine would not have allowed her to build a tolerance. The 35 mg of morphine Mrs. Atkisson received during the surgery and at the PACU would have remained in her system, and could have contributed to her respiratory depression, until between 8 and 10 p.m.

During her two hours in the PACU, Mrs. Atkisson's heart rate, oxygen saturation, respiration rate, and other vital signs were recorded electronically. Her heart rate ranged from 75 to 96 beats per minute, her oxygen saturation ranged from 86 to 100 percent on room air, and her respiration ranged from 12 to 16 breaths per minute. She was discharged from the PACU at about 7 p.m. for delivery to VAMC's telemetry floor, known as "11-AB," where she arrived before 7:10 p.m. The telemetry floor has a capacity of 30 beds. All of the rooms are wired for telemetry but only between six and eight actually have "telemetry capability" at any given time (meaning that some or all of the telemetry patients' vital signs are monitored bedside and the information is transmitted to a nearby monitoring room for observation). The decision to monitor a patient with telemetry can be initiated by a doctor or any

responsible nurse on 11-AB.[3] Although Mrs. Atkisson arrived to the floor with a PCA pump and a significant amount of morphine in her system, she did not receive telemetry. Rather, the standard orders from the PACU, which were written by Dr. Fisher at around 5:30 p.m., were still in effect: The nurses were to assess and document Mrs. Atkisson's level of arousal and respiration rate once per hour for four hours, and to notify a doctor if her systolic blood pressure dropped below 90, pulse rate below 60, or respiratory rate below 10.

Mrs. Atkisson's room on 11-AB was, however, installed with a baby intercom that transmitted sounds to the telemetry room. This is because her PCA pump was equipped with a local alarm that beeps if the pump malfunctions. Under VAMC's "Nursing Service Clinical Alarms Policy," telemetry floor nurses are required to use baby intercoms for patients hooked up to PCA pumps. Fringilla Mabon, a registered nurse on 11-AB, activated the baby intercom in Mrs. Atkisson's room so that telemetry staff would be notified immediately if the pump malfunctioned. Nurse Mabon acknowledged

---

[3]There was somewhat inconsistent trial testimony about whether doctor authorization was required to order telemetry. It was undisputed that, at minimum, the 11-AB nurses themselves had a very significant role in deciding which patients needed telemetry, even if doctor approval was ultimately required. Doctor's permission was not required to continuously monitor a patient's oxygen saturation with a portable pulse oximeter. A pulse oximeter consists of a small plastic clip on a patient's finger that connects to a nearby machine that measures the amount of oxygen in the patient's blood. Oximeters are commonly used on patients in the post-operative period to reduce the threat of respiratory depression.

4

that the baby intercom would pick up sounds from any other local alarm in Mrs. Atkisson's room, such as the alarm from a pulse oximeter.

At 7:30 p.m., Mrs. Atkisson's vital signs were taken by a nurse's assistant, Emily Rico. Her temperature was 97 degrees; she had a pulse rate of 77 and was breathing 20 times per minute at rest; her blood pressure was 101/59, with a pain score of 8 out of 10; and her pulse oximetry reading was 97 percent with supplemental oxygen, according to Nurse Rico's data entry. In fact, Mrs. Atkisson was not on supplemental oxygen at that time. Nurse Mabon testified that she, too, observed Mrs. Atkisson at approximately 7:30 p.m. and made written notes from her assessment, which she later entered into the hospital's electronic database. Nurse Mabon's written remarks were that she, "[o]bserved the patient on arrival to the ward alert and oriented with no noted respiratory distress"; she noted the vital signs taken by Nurse Rico at 7:30 p.m. and wrote, "[c]ondition is stable on arrival to the floor." There was some dispute about when Nurse Mabon wrote and/or entered her remarks into the database. It appears from the timestamp on the top of the electronic record that, in fact, Nurse Mabon entered her assessment at 2:38 p.m. the next day.[4]

_____

[4] This is corroborated by the testimony of VAMC's electronic record keeper, Dr. Hagenlocker, who testified about the data entry system. Nurse Mabon's inconsistent recollections and testimony about recording her remarks causes some apprehension about their probity.

5

Although the trial testimony disclosed considerable confusion among the nurses concerning whether the pulse oximeters used in VAMC in April 2007 were equipped with "telemetry capability"--or, for that matter, whether a patient's respiration could be continuously monitored outside of the hospital's PACU or Intensive Care Unit (ICU)--the Court finds the following facts accurately describe the situation as it existed at the time: (1) the pulse oximeters on 11-AB in April 2007 were not equipped with telemetry capability, though the nurses apparently weren't clear about that at the time; (2) the oximeters were mounted on carts that nurses moved from room to room to periodically measure patients' blood oxygen saturation, as needed; (3) it would have been possible to leave a portable oximeter in a patient's room (though this was apparently not the custom on 11-AB in 2007); (4) leaving an oximeter in a patient's room would not require a doctor's order; (5) the oximeter used to measure Mrs. Atkisson's oxygen saturation was calibrated (or could have easily been calibrated) to sound a local alarm if her oxygen saturation dropped below 85 to 90 percent; (6) the intercom set up in Mrs. Atkisson's room to monitor the PCA pump would have picked up the sound of an oximeter alarm, and transmitted it to the telemetry room; (7) telemetry room staff would have responded as soon as the oximeter alarm sounded, if a portable oximeter had been left in her room; and (8) Mrs. Atkisson's room was closest to the nurses' station on 11-AB, and

6

alarms from her bedside were audible to hospital staff even without
an intercom, based on the credible opinion of plaintiffs' expert
Dr. Alexander Weingarten, who is quite familiar with pulse
oximeters and their alarms, and comments by Nurse Mabon.

Unfortunately, Mrs. Atkisson did not receive oximetry. The
only time her vital signs were observed by any nurse or doctor on
11-AB prior to her respiratory depression was at 7:30 p.m., shortly
before Nurse Mabon's shift was scheduled to finish at 8 p.m.
According to hospital practice, Nurse Mabon was responsible for
making reports to the incoming nurse, Nurse Castro, sometime
between 7:30 and 8 p.m. Although the two nurses differed in their
recollections about whether Nurse Mabon reported to Nurse Castro
about Mrs. Atkisson, the Court accepts Nurse Castro's credible
testimony that no report was made and that she did not learn about
Mrs. Atkisson until approximately 8:15 p.m., when John Atkisson
approached her to report that his wife was not breathing. At this
point, Nurse Castro visited Mrs. Atkisson's room and observed her
breathing only once or twice per minute with an oxygen saturation
of 75 percent. The 75 percent reading reflected Mrs. Atkisson's
oxygen saturation after she was shaken and attempted to be aroused.
Plaintiffs' neurological expert, Dr. Ray Lopez, testified that, in
fact, her oxygen saturation was probably considerably lower than 75
percent in the minutes before she was shaken. At that point, Nurse
Castro summoned doctors and administered supplemental oxygen and

multiple doses of Narcan, a drug that counters the effects of morphine.

The plaintiffs do not complain about the hospital's reaction to Mrs. Atkisson's hypoxemia; nor do they contend that the amount of morphine Mrs. Atkisson received was excessive. Rather, the plaintiffs submit that telemetry floor staff should have taken greater precautions to prevent Mrs. Atkisson's respiratory depression by means of early detection with pulse oximetry.[5]

## II. Analysis

### A. Legal standard

In a negligence action under the Federal Tort Claims Act, the law of the place where the alleged act or omission occurred controls. 28 U.S.C. §§ 1346(b), 2674. The alleged negligence in this suit occurred at the VAMC in Miami, Florida; therefore, Florida law governs. Florida's medical negligence provisions dictate that "the claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider." F.S. § 766.102(1). Further, except in cases where a surgical instrument or supply has

---

[5] Although the plaintiffs' written submissions make general references to "breaches of the standard of care by physicians, nurses, and nursing assistants," the evidence at trial pertained only to the care and supervision Mrs. Atkisson received on 11-AB from nurses. The plaintiffs have not established, or attempted to establish, negligence on the part of any doctor.

been left inside a patient's body after surgery, there is no presumption of negligence; rather, "the claimant must maintain the burden of proving that an injury was proximately caused by a breach of the prevailing professional standard of care by the health care provider." F.S. § 766.102(3). To establish proximate cause in Florida, a plaintiff must prove that the defendant's negligence more likely than not caused the plaintiff's injury. Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984).

**B. Standard of care[6]**

First, the Court must determine the standard of care applicable in this case. Then, the Court must decide whether VAMC hospital staff breached the standard of care. Finally, if a breach occurred, the Court must then decide whether that breach proximately caused Mrs. Atkisson's injury. To assist the Court in making these determinations, each party presented the testimony of expert witnesses. The plaintiffs' expert on standard of care was Dr. Alexander Weingarten, a board certified anesthesiologist and pain management physician with expertise in PCA pumps and caring for patients on morphine. He was accepted as an expert in pain medicine as it relates to physicians, hospitals, and nurses.[7] The

---

[6]The Court's summaries of, or conclusions about, expert testimony represent findings of fact.

[7] The government initially objected to Dr. Weingartern's ability to testify about the standard of care for nurses without an opportunity to voir dire the witness. The objection was withdrawn, however, with the government instead deciding to renew the

defendant offered the testimony of Dr. Juan Restrepo, the board certified attending anesthesiologist at Boca Raton Community Hospital since 2002. Dr. Restrepo has worked at several South Florida hospitals over the course of his training, including Miami VAMC, and is familiar with local practices concerning morphine pumps. He was accepted as an expert in the field of surgical and recovery anesthesia without objection, but admittedly could not offer opinions about the standard of care for nurses.

The experts agreed on several important points. They concurred that Mrs. Atkisson had taken a significant amount of morphine and that respiratory depression is the main hazard of morphine use. They also agreed that each patient reacts differently to the drug, and it is difficult to predict who may suffer respiratory depression as a side effect. Both acknowledged various factors that can increase a patient's risk for respiratory depression, including age, morphine tolerance, the cumulative effect of morphine doses over a short period of time, and whether a patient gets drowsy or falls asleep while on the drug. Both agreed that Mrs. Atkisson did

---

objection (or make a request for voir dire) if the witness testified about the standard of care for nursing. Subsequently, Dr. Weingarten did testify about nursing standard of care, and the government did not object. In any event, having worked directly with nurses and hospital staff concerning morphine delivery for many years, the doctor was qualified to opine on all of the topics of his testimony. His opinions primarily addressed general precautions for monitoring patients on morphine, which do not depend on whether a patient is receiving care from a doctor or a nurse.

not have a tolerance to opioids, and both seemed to accept the reality that she would be apt to fall asleep after a day of surgery. Finally, both acknowledged that VAMC healthcare workers have a duty to observe patients as required by the relevant standard of care regardless of what may be indicated on doctor's orders or by hospital policies.

The doctors disagreed in their opinions on three major inter-related questions: (1) Were Mrs. Atkisson's 7:30 p.m. vital statistics cause for concern? (2) Was it feasible to monitor Mrs. Atkisson's oxygen saturation more closely? and, (3) Did the course of observation Mrs. Atkisson received on 11-AB fall below the relevant standard of care? First, the Court will summarize the experts' opinions about whether hospital staff overlooked warning signs in Mrs. Atkisson's 7:30 p.m. vital signs that her health was deteriorating. Based on Dr. Restrepo's review of the relevant medical records (which were principally Mrs. Atkisson's pre-anesthesia assessment, notes made during her surgery, records from her treatment in the PACU, and the 7:30 p.m. data from Nurse Rico and Nurse Mabon) he characterized Mrs. Atkisson as "not a high risk" for respiratory depression. He observed nothing unusual in the medical records about her reaction to morphine during the operation or up until 7:30 p.m., when her last statistics were taken. From his perspective as an anesthesiologist familiar with the standard of care for physicians, he opined that, based on the

11

vital statistics that were recorded, he would not have wished for nurses caring for one of his patients to provide more frequent observation than Mrs. Atkisson received. Dr. Restrepo acknowledged, however, Mrs. Atkisson was probably in the sole care of nurses from about 5:45 to 8:15 p.m., and he could not offer opinions about the standard of care for nurses. He also acknowledged that an informed interpretation of her vital statistics, or a decision about her proper course of observation, would require knowing how much morphine she had taken, including doses that she self-administered from the PCA pump after she left the PACU. Unfortunately, this information was not recorded. In hindsight, Dr. Restrepo estimates Mrs. Atkisson received an additional 6 mg to 10 mg from the pump between leaving the PACU and 8:15 p.m. when she was diagnosed with hypoxemia. Apparently, none of the telemetry nurses were aware of the amount of Mrs. Atkisson's PCA morphine intake.[8] Nevertheless, in the final analysis, Dr. Restrepo concluded that a reasonable anesthesiologist would have been satisfied knowing that Mrs. Atkisson's breathing was being observed once per hour for four hours, beginning at around 5:30 p.m.

Dr. Weingarten also reviewed Mrs. Atkisson's hospital records. He also did not characterize her as a particularly high risk for

---

[8] The Court also notes the possibility that, to the extent 11-AB staff relied Nurse Rico's 7:30 p.m. data, they may have been operating under the false assumption that Mrs. Atkisson was on supplemental oxygen.

respiratory depression. He was not critical of the total amount of morphine she received and was not critical, *per se*, of Dr. Fisher's order for her to receive direct observation only once per hour (because one per hour would be adequate provided she received oximetry). He did, however, find some cause for concern with respect to the 7:30 p.m. vital signs. He explained that a blood pressure of 101 over 59 is considered low for Mrs. Atkisson, and it would be expected to be higher if she was experiencing significant pain, which she reported as 8 out of 10. In normal patients who are alert and in pain, Dr. Weingarten explained, their blood pressure rises when their pain increases. Mrs. Atkisson's blood pressure was falling despite her self-assessment of severe pain. Therefore, Dr. Weingarten opined that this discrepancy was a sign of a possible problem, and it should have put a reasonable nurse on notice to provide follow-up monitoring to prevent Mrs. Atkisson from deteriorating further.

The experts' second major area of disagreement concerned their views about whether it was feasible (in terms of equipment, administrative burdens, and so forth) to provide oximetry for Mrs. Atkisson on 11-AB. Dr. Restrepo testified that because the oximeters lacked telemetric capability, nurses would need to check the machines in person every few minutes, which would be unrealistic. Even if the machines did have telemetric capability, Dr. Restrepo pointed out the administrative burden on the nursing

13

staff of responding to false alarms (assuming oximetry was used on most or all 11-AB patients). According to Dr. Restrepo, if she needed continuous oximetry she would require care from the PACU or ICU.[9]

By contrast, Dr. Weingarten testified that, in his experience, hospitals routinely provide oximetry for ward patients on PCA pumps. He explained several methods for 11-AB nurses to monitor Mrs. Atkisson's respiration. Because telemetric oximetry was not available at VAMC at the time, Dr. Weingarten proposed the relatively simple baby intercom method, which Nurse Mabon previously recognized as a possibility. In rooms without telemetry or intercoms, Dr. Weingarten testified that it is common for nurses simply to move the oximeter into the hallway and use a longer cord to the patient's finger. He testified that cords come in six foot or twelve foot lengths. The sound of the alarm and blinking lights on the machine in the hallway would be more calculated to catch the attention of a passing nurse or orderly. The witness explained that, because Mrs. Atkisson's room was closest to the nurses'

---

[9] Dr. Restrepo seemed to offer two explanations why continuous oximetry was unavailable on 11-AB. At one point he suggested that a patient needing oximetry is generally the kind of "high risk" patient who requires close observation of multiple risks, which can be done at the ICU, only; at other times, he seemed to suggest that telemetry floors are simply not equipped to provide constant oximetry for low risk patients. His opinions evidentially leave little room for the possibility that an otherwise stable patient might benefit from oximetry because of morphine intake or a PCA pump.

station, the oximeter alarm probably could have been heard even
without moving the unit into the hallway. Finally, Dr. Weingarten
opined that, at the very least, VAMC nurses could have checked on
Mrs. Atkisson with a portable oximeter more frequently than once
per hour, considering her risk factors for respiratory depression.
Dr. Weingarten's testimony about these methods was informative and
essentially uncontested.[10] Indeed, Mrs. Atkisson's room already had
an intercom and it would have been quite realistic for nurses to
leave an oximeter in her room.

The final major area of disagreement concerns the standard of
care. The Court agrees with the credible testimony of Dr.
Weingarten that the nursing care Mrs. Atkisson received on 11-AB
fell below the standard of care. In reaching his opinion about the

_____

[10] At one point Dr. Restrepo suggested that being attached to
an oximeter might increase the risk, in some patients, of
complications associated with post-surgery immobility, such as
blood clots. He later acknowledged that Mrs. Atkisson's medical
condition and the PCA pump already prevented her from walking
around, anyway. Dr. Restrepo also discussed potential complications
from having 40 telemetry floor patients on pulse oximetry at the
same time, emphasizing the potential that numerous false alarms
will signal at once, posing too great a burden on the nurses. In
fact, there are only 30 beds in VAMC's telemetry floor. In any
event, the Court is not moved by Dr. Restrepo's "worst case
scenario" of numerous or simultaneous false alarms. Usually, only
a portion of the patients on 11-AB will be on morphine pumps
requiring constant oximetry. To the extent there were conflicting
opinions about the risks of oximetry, the Court resolves these
disputes in favor of Dr. Weingarten, who identified no risk for
using an oximeter on Mrs. Atkisson. The Court favors the assessment
of Dr. Weingarten because of his greater experience with telemetry
floors, and greater familiarity with the practices and capabilities
of nurses. Dr. Restrepo, on the other hand, spends essentially all
of his working hours in the operating room and the PACU.

15

standard of care, Dr. Weingarten made specific references to the findings of an October 2006 White Paper issued by the Anesthesia Patient Safety Foundation (APSF), an arm of the American Society of Anesthesiology. The White Paper was the result of a convention of medical professionals who met to make conclusions and recommendations concerning (among other things) the use of pulse oximeters in post-operative patients on morphine, based on past years of research and experience. Although the White Paper is not determinative of the standard of care in this case (the parties dispute the relevance and meaning of the findings), the Court agrees that on the whole it substantiates Dr. Weingarten's statements, given the apparent unanimity among convention participants that oximetry should be used in a case such as Mrs. Atkisson's, because of her PCA pump and other risk factors.

Although Mrs. Atkisson's vital signs at 7:30 p.m. were not greatly outside the normal range under the circumstances, the rather low blood pressure despite her significant pain presented a meaningful clue that something was not right. Furthermore, the Court cannot overlook several pieces of evidence that cause some concern about the reliability of the 7:30 p.m. assessment, including, (1) Nurse Rico's incorrect notation that Mrs. Atkisson was on supplemental oxygen, (2) Nurse Mabon's inconsistent testimony about when her assessment was recorded into the computer, and (3) Nurse Mabon's apparent lack of awareness of the 5 or 6 mg

16

of morphine that Mrs. Atkisson may have self-administered from the PCA pump between 7 and 7:30 p.m. Both experts testified that this information would have been necessary to judge Mrs. Atkisson's monitoring needs. Unfortunately, these errors in measuring, recording, and interpreting the 7:30 p.m. vital signs were exacerbated by Nurse Mabon's failure to make a required report before finishing her shift. The fact that Mrs. Atkisson arrived on 11-AB with a PCA pump and considerable morphine already in her body, in addition to her relative intolerance to morphine and obvious potential to fall asleep, her questionable statistics at 7:30 p.m., and the reality of the shift change and the inherent possibility a nurse could fail to make a required report, all weigh in favor of employing one of the uncomplicated and virtually risk-free monitoring solutions proposed by Dr. Weingarten, which would have prevented this injury. Thus, the Court finds that with respect to monitoring a post-operative patient in Mrs. Atkisson's questionable condition, with significant morphine and a PCA pump, and with all the obvious risks of human error by attending nurses (which unfortunately came to pass in this case), the relevant standard of care required closer attention to her respiration than she received.

## C. Proximate cause

Having found that the standard of care was breached with respect to the monitoring Mrs. Atkisson received on 11-AB, the

Court now considers whether this breach was the proximate cause of her hypoxemia and resulting permanent brain injury. In Florida, courts follow the "more likely than not" standard of causation and require proof that the negligence probably caused the plaintiff's injuries. Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984). The plaintiffs argue, through the testimony of Dr. Weingarten and the plaintiffs' neurology expert, Dr. Ray Lopez, that if proper monitoring had been used, hospital staff would have recognized Mrs. Atkisson's respiratory depression almost immediately and delivered supplemental oxygen and Narcan, which would have more likely than not prevented her brain injury.[11] Both experts opined that either continuous oximetry or more frequent in-person observation would have detected early signs of hypoxemia, thereby allowing nurses or doctors to reverse a process that is reversible if treated in a timely manner.[12] Additionally, the neuro-psychologists from both sides who evaluated Mrs. Atkisson found that her cognitive deficits were consistent with the April 19, 2007 episode of hypoxemia. This undisputed testimony establishes to a degree of medical certainty that the defendant's breach of duty

---

[11] Defendant's counsel objected at trial to Dr. Lopez's testimony about whether a quick reaction by medical staff would have prevented Mrs. Atkisson's injury, arguing that was an opinion about "standard of care." Dr. Lopez's opinions are taken into consideration only as they relate to causation and damages, not standard of care.

[12] Dr. Lopez opined that Mrs. Atkisson was probably deprived of oxygen for at least 5 to 6 minutes before she was discovered.

proximately caused Mrs. Atkisson's brain injury.

## D. Damages

### 1. Economic damages

There is no dispute that Susan Atkisson's brain injury is serious and permanent. However, there was some disagreement among the experts about the extent of her injury as it relates to her future attendant care needs. At trial, both Susan and John Atkisson testified about examples of her inability to drive and to perform ordinary chores such as cooking, paying bills, and shopping. The Court also received testimony from the plaintiffs' neuro-psychologist, Doctor Sally Kolitz-Russell, and defendant's neuro-psychologist, Doctor David Lowenstein. Both experts have substantial experience in evaluating patients with brain injuries; both performed thorough nuero-psychological assessments of Mrs. Atkisson, which involved reviewing her medical records, interviewing the plaintiffs, and conducting extensive testing over multiple sessions of Mrs. Atkisson's memory, language abilities, executive functions, judgment, vision, attention, and many other cognitive domains.

Dr. Lowenstein assessed Mrs. Atkisson in September 2009 and issued his report on October 8, 2009. His tests identified mild to moderate deficits in her memory, visual attention, and executive

functions as a result of hypoxemia.[13] With respect to Mrs. Atkisson's attendant care needs, Dr. Lowenstein's primary concern was her reduced capacity to perform so-called "executive functions," including planning and decisionmaking, strategic or abstract thinking, impulse control, and other high level functions. He opined that she may require someone to checkup on her daily with regards to organizational strategies and medication issues, and to drive her to and from medical appointments. Dr. Lowenstein presented two scenarios for Mrs. Atkisson's attendant care needs. First, if John Atkisson were able to regularly fulfill a portion of his wife's attendant care needs (i.e., if he retires and remains in good health), Mrs. Atkisson would require only 4 to 9 hours per week of additional care from a nurse or personal assistant. Dr. Lowenstein's second scenario assumed that Mr. Atkisson would not be available to provide as much regular daily assistance, in which case Mrs. Atkisson would require 3 to 4 hours of outside help per day, for a total of 21 to 28 hours per week. At trial, Dr. Lowenstein hypothesized that, under the second scenario, Mrs. Atkisson would receive her 3 or 4 hours of daily assistance in the morning between about 9 a.m. and 1 p.m., so that the personal aide could help Mrs. Atkisson plan the rest of her day. On cross-

---

[13] The Court notes that both neurological experts administered a similar battery of tests and they agree that their neurological findings are essentially the same. They disagree, however, about how the findings should be interpreted.

examination, Dr. Lowenstein acknowledged that Mrs. Atkisson may wander into a dangerous situation once she is left unsupervised, but drew attention to his experience with patients with more severe cognitive deficiencies who manage to live without 24-hour supervision. Dr. Lowenstein noted that Mrs. Atkisson has lived without constant supervision in the two plus years since the injury without much trouble, pointing out that she takes regular walks to the community center and, on one occasion, flew by herself to visit relatives out of state (albeit with the help of a carefully staged itinerary and frequent telephone contact with Mr. Atkisson).[14]

Dr. Kolitz-Russell initially examined Mrs. Atkisson on three separate days between October and November 2007 and issued her first report on January 16, 2008, noting the mild to moderate brain damage caused by hypoxemia.[15] She later conducted an abbreviated re-

---

[14] Mrs. Atkisson also seems to function fairly well in ordinary social settings with friends at the movies or the casino. In other words, she doesn't need supervision until the moment she does need it. Indeed, no one disputes the several incidents when Mrs. Atkisson became seriously disorientated, confused, forgetful, or careless while driving, cooking, or walking on her own, even in familiar settings. These episodes illustrate the difficulty in deciding when a person with a brain injury such as Mrs. Atkisson's can be safely left alone.

[15] At trial, Dr. Kolitz-Russell acknowledged that in the five to seven years prior to accident on 11-AB, Mrs. Atkisson occasionally reported symptoms of depression, memory loss, anxiety, trouble sleeping, inability to drive, and other conditions. Dr. Kolitz-Russell made two comments about the pre-existing conditions. First, the symptoms were self-reported by Mrs. Atkisson and were not documented by neurological evaluation. Second, the symptoms were episodic and probably related to Mrs. Atkisson ongoing cancer

evaluation on December 16, 2009 and issued a second report on December 23, 2009, ostensibly to determine whether any of Mrs. Atkisson's cognitive deficiencies improved in the intervening two years. In her second assessment, Dr. Kolitz-Russell observed no significant improvement since the prior evaluation, eliminating hope that Mrs. Atkisson's brain injury would heal. If anything, Dr. Kolitz-Russell explained, Mrs. Atkisson's memory and cognitive abilities would deteriorate with age. The second report included a specific recommendation (upon the request of plaintiffs' counsel, apparently) about Mrs. Atkisson's attendant care needs, which was that she should be supervised at all times. This was echoed by the previous testimony of Dr. Lopez, who opined that Mrs. Atkisson would benefit from having a companion or someone nearby at all times, even if this person were just her husband or friends.

Dr. Kolitz-Russell did not offer precise opinions about what kind of supervision Mrs. Atkisson should receive. Instead, she deferred to the Life Care Plans prepared by Ira Morris, Ph.D., the plaintiffs' rehabilitation expert. Mr. Morris prepared his first Life Care Plan on October 1, 2009, based largely on the results Dr. Kolitz-Russell's 2007 neurological evaluation. Mr. Morris proposed

---

treatments and medications. The symptoms were not, in Dr. Kolitz-Russell's opinion, remotely similar in to the permanent cognitive deficiencies she suffered from the hypoxemia. Dr. Lowenstein agreed that the low scores summarized in his report were related to Mrs. Atkisson's April 2007 hypoxemia, rather than pre-existing depression or other maladies.

that Mrs. Atkisson would require a personal assistant for 14 to 28 hours per week for the rest of her life, at the cost of $15 to $17 per hour. On January 8, 2010, Mr. Morris issued an updated Life Care Plan, based on Dr. Kolitz-Russell's December 2009 neurological "re-evaluation." This time, Mr. Morris recommended that Mrs. Atkisson would require 24-hour supervision, at the rate of $15 to $18 per hour (if paid on an hourly basis), or $140 to $195 per day (if paid on a "live in" basis). According to Mr. Morris, the six-fold to twelve-fold increase in his recommendation was based on the allegedly new information in Dr. Kolitz-Russell's 2009 evaluation that Mrs. Atkisson's brain injury was permanent.

Plaintiffs' counsel retained economist and litigation consultant David Williams, Ph.D., to translate the costs of the various rehabilitation plans into money damages.[16] Mr. Williams testified that 24-hour care for the rest of Mrs. Atkisson's life would total $3,582,290, based on an hourly rate; or $1,515,236, based on a "live in" rate. Mr. Williams also analyzed Dr. Lowenstein's proposals and testified that the high-end proposal of 21 to 28 hours per week of attendant care would total $645,228, using the same hourly rate and economic projections used to calculate the Morris plans.

---

[16] All figures are reduced to present value dollars. Although defendant's counsel raised some questions about the inflation rate and other economic assumptions used by Mr. Williams, the Court was satisfied that his calculations were reliable.

At the end of the day, both neuro-psychological experts appeared knowledgeable and qualified to render their opinions in this case. Although Dr. Kolitz-Russell expressed that Mrs. Atkisson should always receive a modicum of supervision when John Atkisson is not present, it was only Mr. Morris who recommended she receive around-the-clock care from a personal aide for the next 26 years. At trial, defendant's counsel raised considerable doubts about Mr. Morris's scientific methods in reaching his recommendation. So far as it appears, Mr. Morris's original proposal of 14 to 28 hours was already premised on his expectation that Mrs. Atkisson wouldn't improve much. Nothing in Dr. Kolitz-Russell's second evaluation was particularly revelatory, she simply restated her original conclusions with slightly more conviction. Mr. Morris nevertheless completely revised his initial proposal.[17] I was perplexed by that.

In consideration of the expert testimony, as well as the testimony of the plaintiffs and Ann Malone (one of Mrs. Atkisson's friends), the Court finds that Mrs. Atkisson's attendant care needs fall somewhere in between the parties' high-end and low-end

---

[17] Mr. Morris wrote on page 18 of his original Life Care Plan that, "Dr. Russell states that the bulk of Mrs. Atkisson's neuropsychological recovery had likely already taken place by the time of [Dr. Kolitz-Russell's] initial evaluation." Dr. Kolitz-Russell's initial evaluation was that Mrs. Atkisson's "current neuropsychological deficits are probably fairly static at this time"; the follow-up evaluation two years later simply added: "her cognitive deficits are likely static *and reflect a permanent injury*" (emphasis added). The difference between "probably fairly static" and "likely static and reflect a permanent injury" seems too slight on substance to warrant Mr. Morris's dramatic revision.

projections. On one hand, the plaintiffs' immediate need for some outside assistance is undisputed. Further, the Court cannot accept Dr. Lowenstein's low-end proposal that their need to hire a daily attendant can, for the most part, be held in abeyance during John Atkisson's life span. On the other hand, the record contains some slightly optimistic characterizations of Mrs. Atkisson's brain injury, and testimony from witnesses on both sides about Mrs. Atkisson's ability to perform certain daily activities, which calls into doubt her need for 24-hour supervision. Neither Mr. Morris nor the plaintiffs have explained, for example, why Mrs. Atkisson would need outside care during the substantial time she spends in the company of her husband, her mother, or other family and friends. Further, Mrs. Atkisson's composure on the witness stand satisfies the Court of her capacity to carry on confidently in a variety of controlled environments without real-time supervision, particularly if a personal aide visits every day to assist with household work and to set Mrs. Atkisson off on a positive, structured trajectory. With some measure of morning assistance, subsequent "check in," and planning, Mrs. Atkisson will be able to safely enjoy many aspects of her day without hired assistance. She also spends time on the evenings and weekends with family or friends during which an assistant would be entirely redundant. Finally, although there may always be some risk that Mrs. Atkisson will wander into trouble, this risk did not prevent her from traveling on her own, finding

25

her way around busy airports, and so forth.

The Court awards $800,000 in economic damages for the costs of Mrs. Atkisson's future attendant care needs. This sum represents a modest increase from Dr. Lowenstein's high-end proposal of 3 or 4 hours per day of outside care (which was valued at $645,228, based on an hourly rate). The increase reflects the reality that Mrs. Atkisson will more likely require up to 5 or 6 hours per day of hourly attendant care, on average. This extra time would permit a personal aide to spend multiple-hour blocks with Mrs. Atkisson in both the morning and afternoon, eliminating some of the experts' stated concerns about the inability to predict when a person with brain injury may become confused, hungry, or stir crazy. The Court awards this amount mindful of some of Dr. Kolitz-Russell's more pessimistic comments about the likelihood of cogitative deterioration, as well as Dr. Lowenstein's own prediction that Mrs. Atkisson may require more than 28 hours per week of assistance at an advanced age.

In addition to this amount, the defendant does not contest the plaintiffs' claim for $124,242 to pay for Mrs. Atkisson's ongoing neurological evaluations, cognitive therapy, psychological counseling, outpatient brain injury rehabilitation, and similar medical expenses. The plaintiffs' total award of economic damages resulting from her brain injury is $924,242.

2. <u>Non-economic damages</u>

In its answer, the government asserted as its Seventh Affirmative Defense that the plaintiffs' ability to recover non-economic damages for medical malpractice is governed by Florida Statute § 766.118, which places various limits on malpractice damages. The plaintiffs moved to strike the government's Seventh Affirmative Defense, contending that § 766.118 of the Florida Statutes violates both the United States and Florida Constitutions. According to the plaintiffs, the statutory cap deprives them of their right to access the courts and to have a trial by jury, and violates principals of due process and equal protection, among other constitutional infirmities. The Court previously stayed the motion to strike pending the outcome of the liability and damages determinations. The constitutional question is now ripe for a decision.

In the recent case of <u>Estate of McCall v. United States</u>, 2009 WL 3163183 (N.D. Fla. Sept. 30, 2009), the district court rejected a substantially identical challenge to the constitutionality of Florida's medical malpractice caps in a thorough and well-reasoned opinion. The plaintiffs have not offered any argument that calls into doubt <u>Estate of McCall</u>, and this Court agrees with its analysis and the outcome. Although the plaintiffs seek non-economic damages in the amount of $1,500,000 for Mrs. Atkisson and $1,000,000 for Mr. Atkisson, the plaintiffs submit to the Court in their post-trial submission that, should the Court uphold the

constitutionality of § 766.118, the statute would reduce the plaintiffs' global amount of recoverable non-economic damages to $750,000, which the Court would be required to apportion between the plaintiffs.

Although Mrs. Atkisson has undoubtably benefitted from the unwavering support of her husband, friends, and family throughout this ordeal, no amount of familial affection can mask the harm this accident inflicted on the Atkissons' marriage and lifestyle. The plaintiffs have established their entitlement to $750,000 in damages, the statutory maximum. The Court apportions the $750,000 using the same ratio presented by the plaintiffs in their claim for non-economic damages.[18] Therefore, the total non-economic damage award is $450,000 to Susan Atkisson, and $300,000 to John Atkisson.

## III. Conclusion

Based on the law, evidence, and testimony presented at trial and duly considered by this Court, it is hereby

## ORDERED AND ADJUDGED:

1. That final judgment is entered on behalf of the plaintiffs, Susan and John Atkisson, and against the defendant, United States of America, in the total amount of $1,674,242, to be

---

[18] That is, three to two, derived from the Atkissons' claim for $1,500,000 to Mrs. Atkisson and $1,000,000 to Mr. Atkisson. For purposes of the record, the Court notes that plaintiffs' non-economic damages are in excess of the statutory cap.

28

distributed as follows:

a) $924,242 in compensatory damages to Susan Atkisson and John Atkisson for present and future expenses associated with the care of Susan Atkisson;

b) $750,000 in compensatory damages to Susan and John Atkisson, for past, present, and future non-economic losses to be apportioned as $450,000 to Susan Atkisson and $300,000 to John Atkisson.

2. Costs are to be taxed against the government.

3. This case is closed.

**DONE AND ORDERED** in Miami, Florida, July 2, 2010.

wSm M Hoeveler

WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT JUDGE

Copies Furnished:   Counsel of Record

29